## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **JOYCE LYNN SHARITZ,** | ) | |
| Plaintiff | ) | Civil Action No. 1:21cv00030 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

### I. Background and Standard of Review

Plaintiff, Joyce Lynn Sharitz, ("Sharitz"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Sharitz protectively filed her application for DIB[2] on April 15, 2019, alleging disability as of March 15, 2013, based on bipolar disorder; complex post-traumatic stress disorder, ("CPTSD"); dissociative disorder;[3] severe depression; severe anxiety; and obsessive-compulsive disorder, ("OCD"). (Record, ("R."), at 35, 188-91, 216.) The claim was denied initially and upon reconsideration. (R. at 113-14, 126-30.) Sharitz then requested a hearing before an administrative law judge, ("ALJ"). (R. at 132-33.) The ALJ held a hearing on October 19, 2020, at which Sharitz was represented by counsel. (R. at 58-80.)

By decision dated November 3, 2020, the ALJ denied Sharitz's claim. (R. at 35-51.) The ALJ found Sharitz met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 37.) The ALJ found Sharitz had not engaged in substantial gainful activity from March 15, 2013, the alleged onset date, through December 31, 2018, the date last insured.[4] (R. at 37.) The ALJ determined that, through the date last insured, Sharitz had severe

---

[2] Sharitz filed a prior application for DIB on June 27, 2017, which was denied at the initial level. (R. at 61-62, 251-52.) On July 21, 2017, Sharitz filed an application for supplemental security income, ("SSI"), alleging disability as of May 1, 2013. (R. at 176-81.)

[3] Dissociative disorders are characterized by an involuntary escape from reality characterized by a disconnection among thoughts, identity, consciousness and memory. *See* https://www.nami.org/About-Mental-Illness/Mental-Health-Conditions/Dissociative-Disorders (last visited May 20, 2022).

[4] Therefore, Sharitz must show she was disabled between March 15, 2013, the alleged onset date, and December 31, 2018, the date last insured, to be eligible for benefits.

impairments, namely post-traumatic stress disorder, ("PTSD"); generalized anxiety disorder; major depressive disorder; bipolar disorder; OCD; and borderline personality traits, but he found Sharitz did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 37-38.)

The ALJ found that, through the date last insured, Sharitz had the residual functional capacity to perform a full range of work at all exertional levels, except she could understand, remember and apply simple instructions and perform simple tasks; she could occasionally interact with co-workers and supervisors, but never interact with the public; she could adapt to occasional changes in the customary workplace setting; and she would be off task 10 percent of the workday. (R. at 41.) The ALJ found that, through the date last insured, Sharitz was unable to perform her past relevant work. (R. at 48.) Based on Sharitz's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of jobs existed in the national economy that Sharitz could perform, including the jobs of a hand packager, a laundry worker II and a packaging machine operator.[5] (R. at 49-50, 76-77.) Thus, the ALJ concluded Sharitz was not under a disability as defined by the Act from March 15, 2013, the alleged onset date, through December 31, 2018, the date last insured, and she was not eligible for DIB benefits. (R. at 50-51.) *See* 20 C.F.R. § 404.1520(g) (2021).

---

[5] The ALJ asked the vocational expert to identify jobs at the medium exertional level; thus, these jobs are unskilled, medium work. (R. at 77.)

After the ALJ issued his decision, Sharitz pursued her administrative appeals, (R. at 173, 327-34), but the Appeals Council denied her request for review.[6] (R. at 1-5.) Sharitz then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Sharitz's motion for summary judgment filed November 29, 2021, and the Commissioner's motion for summary judgment filed January 28, 2022.

## II. Facts

Sharitz was born in 1956, (R. at 62), which, at the time of the ALJ's decision, classified her as a "person closely approaching retirement age" under 20 C.F.R. § 404.1563(e). She obtained a general educational development, ("GED"), diploma, and she has past work experience as a commercial cleaner and general office clerk. (R. at 62-63, 76, 217.) Sharitz testified she had longstanding mental health issues related to a lengthy history of childhood abuse that she repressed until a motor vehicle accident in 2007. (R. at 64-66.) She stated she isolated herself approximately 80 percent of the day, and she had no desire to get out of bed. (R. at 71, 228.) Sharitz stated she drove locally, but since her motor vehicle accident, she was too afraid to drive or ride in a car on the interstate. (R. at 227, 231.) Sharitz's self-reported activities, through her date last insured, included doing routine household chores; driving short distances; preparing simple meals; handling money; taking care of her personal needs; eating out with friends monthly; and spending time with family. (R. at 225-28.) She reported reading and working puzzles before bed, but expressed

---

[6] The Appeals Council acknowledged receipt of a mental impairment questionnaire completed by Robert C. Miller, Ed.D., a psychologist, on March 18, 2021, and correspondence from Miller dated March 22, 2021. (R. at 2.) The Appeals Council stated this evidence did not show a reasonable probability that it would change the outcome of the ALJ's decision; therefore, it was not exhibited as evidence. (R. at 2.)

frustration by her loss of focus when trying to read. (R. at 363.) Sharitz reported she was able to get along with family, friends, neighbors and others; she could follow written and spoken instructions "fairly well;" she could not handle stress or changes in routine; and she could not answer the telephone due to anxiety. (R. at 229-30, 272.)

In rendering his decision, the ALJ reviewed records from Robert C. Miller, Ed.D., a psychologist; Dr. Hillery Lake, M.D., a state agency physician; Dr. Jameson Buston, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Daniel Walter, Psy.D., a state agency psychologist; St. Albans Behavioral Health, ("St. Albans"); Wytheville Family Medicine; Christiansburg Gastroenterology; New River Valley Medical Center;[7] and Wytheville Community Hospital. Sharitz's attorney submitted additional evidence from Miller to the Appeals Council.

The record shows Sharitz received counseling at St. Albans from 2011 through 2020 for bipolar disorder; borderline personality traits; PTSD; panic disorder; and OCD. In 2011 and 2012, Sharitz reported panic and anxiety in driving situations, and she did not want to go outside her home. (R. at 436-41.)

Throughout 2014 Sharitz received counseling at St. Albans for anxiety, depression and difficulty sleeping. Sharitz also reported difficulty coping with stress, stemming from marital problems, financial difficulties and family relationships. (R. at 420, 423, 425, 428.) She described her anxiety and depression symptoms as

---

[7] On June 18, 2014, Sharitz was seen for complaints of abdominal pain, nausea and irregular bowel movements. (R. at 415-16.) An esophagogastroduodenoscopy, ("EGD"), showed minor sigmoid diverticulosis. (R. at 418.)

moderate to severe, but stated her current medication regimen was adequately addressing her psychiatric symptoms. (R. at 406, 408, 410-11, 413, 420, 423, 425.) Sharitz reported her symptoms of depression and anxiety were improving, and her mood was more stable. (R. at 404, 406.) Dr. Anjela K. Arbogast, M.D., a psychiatrist at St. Albans, reported Sharitz endorsed impulsive symptoms, such as picking on her nails and having things in certain order; she was somewhat obsessed with negative thinking; and she had ruminative and obsessive thinking. (R. at 408, 413, 429.)

In March 2014, Dr. Arbogast reported Sharitz was cooperative; she was in mild distress; she was fully oriented; her speech was pressured; she had a normal gait; she had a depressed mood and dysphoric affect; she exhibited no suicidal or homicidal ideations, hallucinations, delusions or paranoia; her concentration, attention and short- and long-term memory were fair; and her insight and judgment were limited. (R. at 430.) Dr. Arbogast also reported Sharitz's muscle tone was normal, and she had no tremor or abnormal movements. (R. at 425.) Sharitz's examinations for the remainder of 2014 showed she was well-groomed, friendly and cooperative; her speech was normal; her mood was "better," with an appropriate affect;[8] her thought processes were linear, logical and goal-directed; she exhibited no suicidal or homicidal ideations or hallucinations; she had normal cognition; her judgment was intact; and her insight was fair. (R. at 407, 409, 411, 414, 421, 424, 427.) Dr. Arbogast reported Sharitz's mood was "overall much more stable." (R. at 408.)

Throughout 2015, Sharitz reported depression and stress. (R. at 392, 394, 396, 399-400.) She reported stressors included the possibility of a divorce and taking care of her ill mother. (R. at 392, 396, 399.) Sharitz described her anxiety and depression

---

[8] On December 9, 2014, Sharitz had a depressed mood and appropriate affect. (R. at 405.)

symptoms as severe, but stated her current medication regimen was adequately addressing her psychiatric symptoms. (R. at 392, 394, 396, 399-400, 402.) She reported her medication was helping with sleep, anxiety, crying spells and panic attacks, and her mood was more stable. (R. at 392, 394, 396, 399-400, 402.) Dr. Arbogast reported Sharitz was well-groomed, friendly and cooperative; her speech was normal; she had a depressed mood and appropriate affect; she exhibited no suicidal or homicidal ideations, hallucinations or delusions; her cognition was normal; her insight was fair; her judgment was intact; and she had no abnormal involuntary movements. (R. at 393, 395, 397, 400, 402-03.)

On February 2, 2016, Sharitz saw Dr. Arbogast and reported her mother had recently passed away, and her depression was worsening. (R. at 390.) She also reported she did not have the energy and motivation to get herself out of bed and take care of herself. (R. at 390.) Dr. Arbogast reported Sharitz had a normal gait; she had normal eye contact; her impulse control was normal; she exhibited no psychomotor disturbances; she had normal speech; her mood was depressed with a dysphoric affect; her thought processes were linear and logical; her associations were intact and not loose; her thought content revealed no suicidal or homicidal ideations, hallucinations, paranoia or delusions; she had limited insight and judgment; her cognition, attention and concentration were intact; and her language was intact. (R. at 390.) On March 2, 2016, Sharitz reported her medication was helping, and her anxiety was under control, but she had difficulty coping with the death of her mother. (R. at 388.) Sharitz's examination remained unchanged, except her speech was low in tone and volume, and she had intact insight and fair judgment. (R. at 388.) At subsequent visits, Sharitz continued to report her mood, sleep, anxiety and energy had improved with medication, and her anxiety was under control. (R. at

385-86.) Her examinations remained unchanged, except her affect was euthymic. (R. at 385, 387.)

On September 22, 2016, Sharitz saw Dr. Arbogast, stating she had started having panic and anxiety attacks due to difficulty coping with multiple stressors. (R. at 383.) Dr. Arbogast reported Sharitz's change in mood and anxiety was situational. (R. at 383.) On November 21, 2016, Dr. Arbogast reported Sharitz was "as always very dramatic, crying [and] blaming others" as she discussed how some of her belongings that she had packed up to move had gone missing from her estranged husband's house. (R. at 381.) She reported Sharitz was very self-centered, dramatic and regressed very fast under stress. (R. at 381.) Dr. Arbogast reported she believed Sharitz had a personality disorder rather than a bipolar disorder. (R. at 382.) On December 20, 2016, Sharitz reported she was less anxious and less depressed after spending time with her children and grandchildren. (R. at 379.) Dr. Arbogast reported no change in her examination findings, except she found Sharitz's mood was better. (R. at 380.)

At her counseling sessions in 2017, Sharitz reported she felt better after spending time with her children and grandchildren. (R. at 374, 376-77.) Examinations showed Sharitz had a normal gait; her grooming was normal; she made good eye contact; her impulse control was normal; she exhibited no psychomotor disturbances; her speech was normal; her mood was "better," with a normal affect; her thought processes were linear and logical; her associations were intact and not loose; her thought content exhibited no suicidal or homicidal ideations, hallucinations, paranoia or delusions; her insight and judgment were fair; and her cognition, attention and concentration were intact. (R. at 374, 376, 378.) On September 18, 2017, Sharitz reported feeling "very anxious" and "increasingly

depressed." (R. at 370.) She stated she had suicidal thoughts, but no plan or intention. (R. at 370.) Sharitz reported flashbacks with certain triggers and frequent nightmares. (R. at 370.) Her examination remained unchanged, except she had an anxious mood. (R. at 371.)

On September 19, 2017, Dr. Hillery Lake, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), indicating Sharitz had mild limitations in her ability to understand, remember or apply information, to interact with others and to concentrate, persist or maintain pace; and no limitations in her ability to adapt or manage herself. (R. at 87-88.)

On September 20, 2017, Dr. Jameson Buston, M.D., a state agency physician, completed a medical assessment, indicating Sharitz had the residual functional capacity to perform medium[9] work and push/pull as much as the lift/carry restrictions. (R. at 89-90.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 90.)

On November 16, 2017, Sharitz saw Kristy S. Karas, C.R.N.P., a certified registered nurse practitioner at St. Albans, stating she was feeling very anxious and increasingly depressed. (R. at 366-67.) She reported recently signing her divorce papers and expressed mixed emotions about it. (R. at 367.) Sharitz stated she started a gym membership, as she enjoyed exercising. (R. at 367.) Her examination findings remained unchanged. (R. at 368.) On November 28, 2017, Brian T. Lusk, L.P.C., a licensed professional counselor with St. Albans, reported Sharitz was fully oriented; her mini-mental state examination was within normal limits; her mood and affect

---

[9] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2021).

were stable; her reality testing and impulse control were intact; and her speech was normal. (R. at 366.) Lusk diagnosed PTSD and mood disorder. (R. at 366.) Sharitz's examination findings remained unchanged in December 2017. (R. at 365.)

On January 16, 2018, Sharitz reported she was "doing better" and stated she had spent the holidays with family. (R. at 365.) Lusk reported Sharitz was fully oriented; her mini-mental state examination was within normal limits; her mood and affect were stable; her reality testing and impulse control were intact; and her speech was normal.[10] (R. at 365.) On January 30, 2018, Sharitz reported having a "stressful" day which she attributed to babysitting her three-year-old granddaughter. (R. at 364.) On February 13, 2018, Sharitz reported improvement in her sleep, which she attributed to changes to her sleep hygiene. (R. at 363.) She stated she was reading and/or working puzzles before going to bed, but was frustrated because she was struggling to read due to issues with focus. (R. at 363.)

On February 16, 2018, Sharitz saw Karas and reported she was very anxious and increasingly depressed. (R. at 361.) Sharitz reported that three family members had passed away in recent months. (R. at 361.) She reported moderate obsessive and compulsive symptoms, such as skin picking and picking at her scalp. (R. at 361.) Sharitz stated her hands had been trembling for days due to anxiety. (R. at 361.) Karas reported Sharitz had a normal gait; her grooming was normal; she made good eye contact; her impulse control was normal; she exhibited psychomotor disturbances and hand tremulousness; her speech was normal; her mood was anxious with a normal affect; her thought processes were linear and logical; her associations were intact and not loose; her thought content exhibited no suicidal or homicidal

---

[10] Throughout 2018, Lusk's examination findings remained unchanged. (R. at 354-55, 358-60, 363-64.)

ideations, hallucinations, paranoia or delusions; her insight and judgment were fair; and her cognition, attention and concentration were intact.[11] (R. at 362.)

On October 31, 2018, Sharitz saw Sandra Grazulewicz, P.A., a physician's assistant with St. Albans, and reported she continued to have nightmares and trouble concentrating. (R. at 344.) Grazulewicz reported Sharitz had an obvious bilateral hand tremor due to anxiety.[12] (R. at 344.) She reported Sharitz had a normal gait and station; her speech was normal; her mood was anxious with a congruent affect; her thought processes were linear and logical; her associations were intact; she exhibited no suicidal or homicidal ideations, hallucinations, delusions or obsessions; her insight and judgment were normal; she was fully oriented; her recent and remote memory were intact; and her attention and concentration were normal. (R. at 346.) She diagnosed PTSD, chronic; generalized anxiety disorder with panic attacks; bipolar disorder, per history; and OCD. (R. at 346.) On November 28, 2018, Robert M. Tuosto, L.C.S.W., a licensed clinical social worker with St. Albans, reported Sharitz was fully oriented; her mood and affect were stable; her reality testing and impulse control were intact; her speech was normal; and she had no suicidal or homicidal ideations. (R. at 343.)

In 2019, Sharitz's examinations showed she was fully oriented; her mini-mental state was within normal limits; her mood and affect were stable; her reality testing and impulse control were intact; her speech was normal; her thought processes were intact; and her thought content was appropriate. (R. at 570, 575-78,

---

[11] Karas's examinations in April and August 2018 remained unchanged, except Sharitz's hand tremulousness was better, and her speech was moderate in rate, rhythm and intensity. (R. at 352, 357.)

[12] Despite noting Sharitz had an obvious bilateral hand tremor, Grazulewicz's examination findings stated psychomotor disturbances were absent. (R. at 344, 346.)

1032, 1035.) Sharitz routinely reported her activity level had increased, including bathing and cooking two to three times a week; visiting friends and family; walking up to four times a week; completing puzzles; and watching medieval documentaries up to seven days a week. (R. at 570, 574-78, 1032, 1045.) On January 31, 2019, Sharitz also reported her bilateral hand tremor had decreased. (R. at 579.)

On August 19, 2019, Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF, indicating Sharitz had mild limitations in her ability to understand, remember or apply information; and moderate limitations in her ability to interact with others, to concentrate, persist or maintain pace and to adapt or manage herself. (R. at 97-98.) Jennings opined Sharitz would be limited to simple, unskilled work. (R. at 98.)

That same day, Jennings completed a mental assessment, finding Sharitz had moderate limitations in her ability to carry out detailed instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 99-100.) Jennings stated Sharitz's work-related mental abilities were, otherwise, not significantly limited. (R. at 99-100.) Jennings noted Sharitz had periods during which her anxiety and depression improved, but she did later regress. (R. at 100.) She noted Sharitz did have "restricted range/affect" over periods of time. (R. at 100.)

On November 20, 2019, Dr. Bert Spetzler, M.D., a state agency physician, stated there was insufficient evidence prior to Sharitz's date last insured to evaluate

her claim pertaining to her physical impairments. (R. at 104-05.) On November 21, 2019, Daniel Walter, Psy.D., a state agency psychologist, also found that there was insufficient evidence prior to Sharitz's date last insured to evaluate her claim pertaining to her mental impairments. (R. at 105-06.)

On January 14, 2020, Sharitz saw Rhonda Johnson, N.P.-C., a certified nurse practitioner with St. Albans, and reported recurrent nightmares and anxiety.[13] (R. at 1065.) Johnson reported Sharitz was cooperative; she had normal eye contact; her impulse control was normal; she exhibited no psychomotor disturbances; her speech was normal; her mood was "bad and sick;" her affect was "sick;" her thought processes were linear and logical; her associations were intact; she exhibited no suicidal or homicidal ideations, hallucinations, delusions or paranoia; her insight and judgment were good; she was fully oriented; her recent and remote memory were intact; and her attention and concentration were fair. (R. at 1066.) Johnson's examination findings remained unchanged in February and August 2020, except in August, Sharitz's mood was "elated;" her speech was rapid; and her thought processes were nonlinear. (R. at 1059, 1062.)

On January 27, 2020, Johnson completed a Mental Impairment Questionnaire. (R. at 1053-55.) Johnson diagnosed Sharitz with PTSD, generalized anxiety disorder and OCD. (R. at 1053.) Johnson opined Sharitz had mild limitations[14] in her ability to remember work-like procedures; to carry out very short and simple instructions; to ask simple questions or request assistance; and to adhere to basic standards of

---

[13] Sharitz also complained of headaches and vomiting. (R. at 1065.)

[14] Mild means there is some mild limitation, but the individual can generally function well. (R. at 1054.)

neatness and cleanliness. (R. at 1054.) She opined Sharitz was moderately limited[15] in her ability to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being unduly distracted; to make simple work-related decisions; to be aware of normal hazards and take appropriate precautions; to understand, remember and carry out detailed instructions; to set realistic goals or make plans independently of others; and to deal with stress of semi-skilled and skilled work. (R. at 1054.)

Johnson found Sharitz had marked limitations[16] in her ability to maintain regular attendance and be punctual within customary, usually strict tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; to respond appropriately to changes in a routine work setting; to deal with normal work stress; to interact appropriately with the general public; to maintain socially appropriate behavior; and to travel in unfamiliar places. (R. at 1054.) Johnson also opined Sharitz had extreme limitations[17] in her ability to use public transportation. (R. at 1054.) She further found Sharitz had moderate difficulties in maintaining social functioning, and she experienced one or two episodes of decompensation within a 12-month

---

[15] Moderate means moderate limitation, but the individual still is able to function satisfactorily. (R. at 1054.)

[16] Marked means the ability to function is severely limited, but not precluded. (R. at 1054.) It means the individual cannot satisfactorily perform the activity independently, appropriately, effectively and on a sustained basis in a regular work setting. (R. at 1054.)

[17] Extreme means the individual cannot perform the activity in a regular work setting. (R. at 1054.)

period, each of at least two weeks duration. (R. at 1055.) Johnson opined Sharitz would be absent from work more than four days per month, and her limitations related back to June 27, 2017. (R. at 1055.)

On September 17, 2020, Robert Miller, Ed.D., a licensed clinical psychologist, evaluated Sharitz at the request of her attorney. (R. at 1111-17.) Sharitz sated she could be left alone and functioned reasonably well independently around the home, but was isolated and became extremely anxious when in public. (R. at 1114.) She reported her bipolar symptoms had improved with treatment and reduction in stress. (R. at 1114.) Miller reported Sharitz was cooperative; she had engaged eye contact; her grooming and hygiene were casual and neat; she had no physical deformities, but suffered aches, pains and pain symptoms, such as gastrointestinal issues and migraine headaches, which appeared to correlate with increased stress levels; she had logical and coherent speech; she was fully oriented; and her mood was anxious and depressed with a flat affect. (R. at 1114.) The Personality Assessment Inventory, ("PAI"), indicated Sharitz experienced disturbing traumatic events, which resulted in her becoming socially isolated. (R. at 1116.) In addition, Miller reported Sharitz's thought processes were marked by confusion, distractibility and difficulty concentrating. (R. at 1116.) Miller diagnosed PTSD with dissociative symptoms and bipolar II disorder, most recent episode depressed in the moderate to severe range. (R. at 1117.) Miller opined the potential for Sharitz to engage in sustained, consistent and substantial work-related behavior was extremely limited, if even possible. (R. at 1117.) He reported efforts to return to work likely would result in episodes of decompensation. (R. at 1117.)

On March 18, 2021, Miller completed a Mental Impairment Questionnaire. (R. at 23-25.) Miller diagnosed Sharitz with PTSD and bipolar II disorder. (R. at 23.)

Miller opined Sharitz was moderately[18] limited in her ability to understand, remember and carry out very short and simple instructions; to ask simple questions or request assistance; to be aware of normal hazards and take appropriate precautions; and to adhere to basic standards of neatness and cleanliness. (R. at 24.) He found Sharitz had marked[19] limitations in her ability to remember work-like procedures; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; to respond appropriately to changes in a routine work setting; to understand and remember detailed instructions; to set realistic goals or make plans independently of others; to maintain socially appropriate behavior; to travel in unfamiliar places; and to use public transportation. (R. at 24.)

Miller also opined Sharitz had extreme[20] limitations in her ability to maintain attention for two-hour segments; to maintain regular attendance and be punctual within customary, usually strict tolerances; to work in coordination with or in proximity to others without being unduly distracted; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to deal with normal work stress; to carry out detailed instructions; to deal with stress of

---

[18] Moderate means the individual is moderately limited, but still able to function satisfactorily. (R. at 24.)

[19] Marked means the ability to function is severely limited, but not precluded. The individual cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting. (R. at 24.)

[20] Extreme means the individual cannot perform this activity in a regular work setting. (R. at 24.)

semi-skilled and skilled work; and to interact appropriately with the general public. (R. at 24.) Miller found Sharitz had extreme limitations on her ability to perform activities of daily living and to maintain concentration, persistence or pace; marked difficulties in maintaining social functioning; and she experienced four or more episodes of decompensation within a 12-month period, each of at least two weeks duration. (R. at 25.) He opined Sharitz would be absent from work more than four days per month, and her limitations related back to June 27, 2017. (R. at 25.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715

F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Sharitz argues the ALJ's decision did not reflect a function-by-function analysis as was addressed in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). (Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 3-7.) Specifically, Sharitz argues that physical and/or environmental limitations were needed to accommodate her fatigue, distress and hand tremor. (Plaintiff's Brief at 4.) She also argues the ALJ erred in assessing the medical evidence by finding the opinions of Johnson and Miller unpersuasive. (Plaintiff's Brief at 7-16.) Sharitz further argues the evidence submitted to the Appeals Council was "new" and "material" and warrants a remand. (Plaintiff's Brief at 16-19.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations

governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2021) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[21]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

---

[21] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions 20 C.F.R. § 404.1513(a)(2) (2021). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2021).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2021).[22] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2021).

---

[22] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

Sharitz argues the ALJ's decision did not reflect a function-by-function analysis. (Plaintiff's Brief at 3-7.) Specifically, Sharitz argues that physical and/or environmental limitations were needed to accommodate her fatigue, distress and hand tremor. (Plaintiff's Brief at 4.) She also argues the ALJ erred in assessing the medical evidence by finding the opinions of Johnson and Miller unpersuasive. (Plaintiff's Brief at 7-16.) A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a) (2021). As noted above, Sharitz must show she was disabled between March 15, 2013, the alleged onset date, and December 31, 2018, the date last insured. The ALJ found that, through the date last insured, Sharitz had the residual functional capacity to perform a full range of work at all exertional levels, except she could understand, remember and apply simple instructions and perform simple tasks; she could occasionally interact with co-workers and supervisors, but never interact with the public; she could adapt to occasional changes in the customary workplace setting; and she would be off task 10 percent of the workday. (R. at 41.)

In making his residual functional capacity finding, the ALJ found Johnson's January 2020 mental assessment "unpersuasive" and "inconsistent." (R. at 47.) The ALJ found Johnson's checkbox form assessment provided no narrative rationale,

and her own treatment notes offered minimal support for the proposed limitations during the period at issue, as Johnson's treatment began after Sharitz's date last insured. (R. at 47.) The ALJ further found Johnson's proposed disabling limitations were inconsistent with Sharitz's overall conservative course of treatment, documented response to treatment and observed mental status. (R. at 47.) Sharitz often related her anxiety and depression to stressors, such as marital problems, financial difficulties, family relationships and the death of family members, and, in 2016, Dr. Arbogast reported Sharitz's anxiety was situational. Sharitz's examination findings from 2014 through 2019 routinely showed she was well-groomed, friendly and cooperative; her speech was normal; her mood was depressed; her thought processes were linear, logical and goal-directed; her thought content was normal; she had normal cognition; her judgment and insight ranged from limited to normal; her attention and concentration were intact; her mini-mental state examinations were normal; and her reality testing was intact. Although Sharitz often described her anxiety and depressive symptoms as moderate to severe, she routinely stated her medication regimen was adequately addressing her psychiatric symptoms. In fact, she reported her depression, anxiety, sleep, crying spells, panic attacks and mood were improved with medication. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Furthermore, when Johnson first saw Sharitz in January 2020, she found Sharitz was cooperative; she had normal eye contact; her impulse control was normal; she exhibited no psychomotor disturbances; her speech was normal; her thought processes were linear and logical; her associations were intact; she exhibited no suicidal or homicidal ideations, hallucinations, delusions or paranoia; her insight and judgment were good; she was fully oriented; her recent and remote memory

were intact; and her attention and concentration were fair. (R. at 1066.) Although Johnson found Sharitz's mood was "bad and sick," and her affect was "sick," it is noted that Sharitz also was complaining of headaches and vomiting. (R. at 1066.)

The ALJ also found Miller's September 2020 opinion "unpersuasive" because the evaluation on which the opinion was based occurred more than one year after Sharitz's date last insured and not probative of her functional status during the period at issue. (R. at 47-48.) In March 2021, Miller found Sharitz was moderately to extremely limited in all areas of making occupational, performance and personal/social adjustments. However, there is no indication that Miller saw Sharitz following his September 2020 evaluation when he found Sharitz was cooperative; she had engaged eye contact; she had logical and coherent speech; she was fully oriented; and her mood was anxious and depressed with a flat affect. Miller also found Sharitz's ability to sustain "consistent, and substantial work-related behavior at this time is extremely limited if at all possible" and stated that an attempt to work likely would result in decompensation. (R. at 1117.) The ALJ found that, although Miller's opinion did not explicitly state that Sharitz was disabled, it was stated in such broad terms as to potentially constitute a statement on an issue that is reserved to the Commissioner. *See* 20 C.F.R. § 404.1520b(3)(1) (2021). As noted above, Sharitz's anxiety and depressive symptoms improved with medication, and, other than a depressed and anxious mood and dysphoric affect, her examination findings generally were normal. In addition, to support his finding, the ALJ noted Sharitz's activities, such as the ability to take her medications without reminders; to take care of her personal needs; to prepare simple meals and do routine household chores; to visit friends monthly; to regularly visit with family at the river; to do daily puzzles; and to watch television. (R. at 45-46.) Sharitz also reported she joined a gym, and she babysat her granddaughter.

The ALJ found the state agency psychological consultant's mental assessment at the initial level "mostly persuasive," but additional limitations were warranted. (R. at 46.) Based on Sharitz's hearing testimony and her anxious and/or depressed clinical presentations, the ALJ found Sharitz could have no public interaction and only occasional interaction with co-workers and supervisors. (R. at 47.) He also found Sharitz would have some off-task behavior due to her documented complaints of poor sleep, nightmares, flashback, panic attacks and other psychiatric symptoms. (R. at 47.)

The ALJ further noted Sharitz alleged very poor tolerance of stress and changes in routine. (R. at 40.) As noted above, Sharitz often related her anxiety and depression to stressors, such as marital problems, financial difficulties, family relationships and the death of family members, and, in 2016, Dr. Arbogast reported Sharitz's anxiety was situational. The ALJ stated he accounted for these limitations by limiting Sharitz to simple work with only occasional changes in the customary workplace setting. (R. at 40-41.) The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a) (2021); *Menkes v. Astrue,* 262 F. App'x 410, 412 (3d Cir. 2008) ("[P]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration."). Unskilled work generally is low stress and involves remembering only very short and simple instructions in a routine environment in which "concentration is not critical." Program Operations Manual System, ("POMS"), DI 25020.010(B)(3), available at http://policy.ssa.gov/poms.nsf/lnx/0425020010 (effective Apr. 5, 2007) (explaining that unskilled work involves "remember[ing] very short and simple instructions," and that "concentration is not critical").

The ALJ found the state agency medical consultant's September 20, 2017, physical assessment "unpersuasive" because it was not well-supported.[23] (R. at 48.) Dr. Buston found Sharitz had the residual functional capacity to perform medium work with no other limitations. The ALJ erroneously found this assessment was related to Sharitz's prior disability application. (R. at 48.) While the ALJ found Sharitz could perform a full range of work at all exertional levels, he asked the vocational expert to identify jobs at the medium level of exertion within the limitations as found in his residual functional capacity finding.

I do not find Sharitz's argument that the ALJ failed to accommodate her hand tremor persuasive. While Sharitz was noted to have hand tremulousness in February 2018 after attending a funeral, it was reported as "better" at her visits in April and August 2018, and, in January 2019, Sharitz reported that her bilateral hand tremor had decreased. As noted above, it routinely was reported that Sharitz exhibited no psychomotor disturbances.

Finally, Sharitz argues the evidence submitted to the Appeals Council was "new" and "material" and warrants a remand. (Plaintiff's Brief at 19.) I am not persuaded by this argument. The Appeals Council must consider evidence submitted to it when it is deciding whether to grant review, "'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" *Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). Evidence is "new" if it is "not duplicative or cumulative." *Wilkins*, 953 F.2d at 96 (citation omitted). Evidence is "material" if there is a "reasonable possibility that the

---

[23] The record shows Sharitz sporadically received treatment for an upper respiratory infection; back pain with sciatica, which improved with medication; neck pain; headaches; and chronic gastritis. (R. at 373, 415-18, 434, 829-34, 1083, 1088, 1090, 1094.)

new evidence would have changed the outcome." *Wilkins*, 953 F.2d at 96 (citing *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985)). In addition to showing the evidence is both new and material, the claimant seeking a remand must show good cause for her failure to submit the evidence when the claim was before the Commissioner. *See Owens v. Astrue*, 2010 WL 3743647, at *4 (W.D. Va. Sept. 22, 2010) (citing *Borders*, 777 F.2d at 955).

The Appeals Council rejected the mental impairment questionnaire completed by Miller dated March 18, 2021, and correspondence from Miller dated March 22, 2021, because they did not show a reasonable probability that they would change the outcome of the ALJ's decision.[24] (R. at 2.) Any evidence submitted to the Appeals Council that it considers becomes part of the record that the court reviews to determine whether the Commissioner's decision is supported by substantial evidence. *See Wilkins*, 953 F.2d at 96. The court conducts this review under sentence four of 42 U.S.C. § 405(g) and may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is not warranted where substantial evidence in the record supports the ALJ's decision despite the additional evidence. *See Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

---

[24] The Appeals Council also noted that it did not "exhibit this evidence." (R. at 2.) Any evidence that was not submitted to the Appeals Council, or that the Appeals Council chose not to incorporate into the record, is reviewed under sentence six of 42 U.S.C. § 405(g), which is narrower than sentence four. Sentence six allows a court to remand for the consideration of additional evidence if it is new and material, and good cause exists for its late submission, and the claimant must "present to the remanding court at least a general showing of the nature of the new evidence." *Owens*, 2010 WL 3743647, at *4 (citing *Borders*, 777 F.2d at 955). A court's authority under sentence six is limited to remanding the case for "additional evidence to be taken," *Wooding v. Comm'r of Soc. Sec.*, 2010 WL 4261268, at *2 (W.D. Va. Oct. 29, 2010), and it may not "rul[e] as to the correctness of the administrative determination." *Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citation omitted).

The Appeals Council determined there was no reasonable probability that Miller's mental impairment questionnaire and correspondence would change the outcome of the ALJ's decision. (R. at 2.) As noted above, the ALJ explained his consideration of this evidence. Accordingly, remand for further consideration of the Appeals Council evidence is unwarranted.

For all the above-stated reasons, I find substantial evidence exists to support the ALJ's consideration of the opinion evidence, as well as his resulting residual functional capacity finding and ultimate finding that, through the date last insured, Sharitz was not disabled and not entitled to DIB benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's finding regarding Sharitz's residual functional capacity; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Sharitz was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Sharitz's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    May 20, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE